**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00003-CV**

_____

**CODY NEIL TAYLOR, Appellant**

**V.**

**ERICA DUCKWORTH AND LEIGH PEASTER, Appellees**

_____

**On Appeal from the 172nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 23DCCV0756**

_____

**MEMORANDUM OPINION**

The underlying litigation began when Appellant Cody Neil Taylor ("Taylor")

became dissatisfied with the outcome of a modification proceeding in a suit affecting

his parent-child relationship with his minor daughter. After the modification

proceeding, Taylor sued his daughter's licensed professional counselor ("LPC"),

Erica Duckworth ("Duckworth") and her assistant, Leigh Peaster ("Peaster"), for

intentional infliction of emotional distress, alleging their "conduct was malicious"

and that they intentionally and negligently mispresented facts to the court, which

1

damaged his relationship with his daughter.[1] Duckworth counterclaimed for defamation, and Taylor moved to dismiss the counterclaim under the Texas Citizens' Participation Act (TCPA).[2] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001–.011. In this interlocutory appeal, we must decide whether the trial court erroneously denied Taylor's TCPA Motion to Dismiss Duckworth's counterclaim for defamation. *See id.* § 27.005 (outlining process for motions to dismiss under the TCPA and trial court's ruling), 51.014(a)(12) (allowing for interlocutory appeal of denial of TCPA motion to dismiss). In one issue, Appellant asks whether the trial court should have dismissed Duckworth's counterclaim and more specifically whether: (1) Duckworth's counterclaim against Taylor was "based on" his exercise of the right of free speech or his exercise of the right to petition; (2) Duckworth failed to establish by clear and specific evidence a prima facie case for each essential element of her defamation claim; and (3) if Duckworth established a prima facie case, did Taylor establish an affirmative defense. *See id.* § 27.005. For the reasons discussed below, we affirm the trial court's denial of Taylor's TCPA Motion to Dismiss Duckworth's counterclaim.

---

[1]The trial court granted Duckworth's and Peaster's Rule 91a Motion to Dismiss Taylor's claims. That interlocutory order is not a subject of this appeal.

[2]Peaster did not counterclaim for defamation, yet she was included in Taylor's TCPA Motion to Dismiss.

# I. Background

Taylor lost custody of his daughter, "Sara," when a separate protracted legal dispute resulted in an Order in Suit to Modify Parent-Child Relationship dated November 21, 2022.[3] Duckworth is an LPC who began counseling Sara in 2019 during the modification proceeding. After the modification order was entered in the SAPCR, Taylor sued Duckworth and Peaster.

## A. Taylor's Claims

Taylor alleges that throughout the custody proceeding, "Defendants provided malicious, fraudulent, and deceiving testimony, affidavits, and/or evidence in support of [Mother's] effort to limit and later restrict Plaintiff's parenting time with his daughter." He also claims that in the custody case Duckworth violated her licensing statutes and ethics "to provide the court with misleading evaluations, testimony, reports to law enforcement, and opinions in which she was never in a position to provide."

Taylor complains that in early 2020, Duckworth submitted an affidavit that was attached to Mother's request for a temporary restraining order ("TRO") in the custody proceeding that described an incident where he entered her office.

---

[3]To protect the child's privacy, we use a pseudonym to identify her and other family members who were involved in the SAPCR but are not parties to this appeal. *See Cunningham v. Waymore*, 612 S.W.3d 47, 52 n.1 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Duckworth reported this incident to the Beaumont Police Department. Taylor asserts that Duckworth's account of the events in her affidavit were not "truthful or factual." Duckworth and Peaster also testified at the TRO hearing, and Taylor claims this testimony was false. Taylor alleges this testimony resulted in the judge in the custody proceeding ruling for Mother and in February 2020, restricting his access to his daughter to two eight-hour visits per month.

Taylor outlines that in May 2020, he filed a "criminal complaint" with the Jefferson County Sheriff's Department alleging that Duckworth committed perjury, among other things. He also alleges that the District Attorney took his complaint to the Jefferson County Grand Jury.[4]

**B. Duckworth's Counterclaim**

In September 2023, Duckworth and Peaster filed "Defendants' First Amended Answer, Verified Plea, Affirmative Defenses, Counterclaim, and Amended Special Exceptions." That pleading included Duckworth's counterclaim for defamation.

In her counterclaim, Duckworth states that she is an LPC in private practice and first saw Sara in June 2019 due to Mother's concerns. Mother brought Sara to see Duckworth, "who was one of many counselors [Sara] saw over a period of time." Among other things, Duckworth explains that Sara "exhibited symptoms of anxiety,

---

[4]On October 13, 2021, the Grand Jury no-billed the charge, and the District Attorney's office advised no other charges against Duckworth were pending.

4

guilt, irritability, and tearfulness." Duckworth describes Sara as "expressive, talkative, and able to participate in sessions," although "she exhibited signs of worry and anxiety when discussing her father[.]" Duckworth also states in the petition that the parents had been divorced about four years when she saw Sara, and "the divorce had been described as a high-conflict divorce and had continued into a long, bitter custody battle." Duckworth notes that in February 2016, the Final Decree of Divorce ordered that Sara's parents would be joint managing conservators with a standard possession order and giving Mother the exclusive right to designate Sara's primary residence. Since then, the parties have been embroiled in a "bitter custody battle resulting in the filing of multiple Motions and hearings including Motions for Psychological Examinations, Motions to Modify the Parent-Child Relationship, and numerous enforcement orders."

Duckworth explains that in February 2020, after hearings where she and others testified, including other counselors who saw Sara, the family court entered temporary orders "that significantly reduced Mr. Taylor's right to possession of Sara[.]" The court also ordered Taylor to: (1) secure his firearms in a locked gun safe during his possession of Sara; (2) cease videotaping or recording the other party; (3) cease questioning Sara regarding events at the other parent's home; and (4) stop appearing at Sara's school. Duckworth alleges that after a multi-day hearing, the judge in the custody case denied Taylor access to Sara's records maintained by

5

Duckworth, because "the production of those records to Mr. Taylor would be detrimental to [Sara]" and later entered a second order denying Taylor access to the records.

In her counterclaim, Duckworth describes an incident in December 2019 where Taylor arrived at her office after hours without an appointment and insisted on talking to her. She says she explained to Taylor she needed to leave, but he kept talking and recorded her without her knowledge or consent. Duckworth claims that Taylor "exhibited signs of agitation and paranoia," which caused her to fear for her safety. According to Duckworth, Taylor also videotaped another patient in her waiting room "in violation of that patient's HIPAA privacy rights."

Duckworth explains that several days later, Taylor called her assistant, Peaster, and asked for Sara's records. So, Peaster emailed the requisite paperwork for Taylor to request the records, which he said he would complete and return. On January 13, 2020, Taylor returned to Duckworth's office without an appointment and unannounced to get Sara's records. He did so after telling building security he was returning forms which allowed him to access Duckworth's suite, although he did not have the requisite forms with him. Duckworth then explains that Taylor entered Peaster's office in the suite, sat down and asked to complete the required forms but then refused to complete them. She says that Taylor "had an aggressive tone and used loud volume" and "talked about having a concealed [handgun] carry

license, and church mass shootings, and kept looking around the office for cameras, insisting they had them, which they did not at the time." Duckworth notes that "Taylor expressed his resentment in discussing Ms. Duckworth's fee, stating that he knew he was aggressive and used forceful language but that he would do anything for his daughter."

According to Duckworth's counterclaim, while Taylor was sitting in Peaster's office, Peaster was "concerned for her safety" and afraid of Taylor, "given his aggressive and irrational behavior[,]" and "left the office that day in fear not only for herself but for Ms. Duckworth as well." Duckworth asserts that given Taylor's behavior in her office, she "was concerned for herself, Ms. Peaster, [Sara] and [Mother]." Duckworth states that she conducted independent research confirming that Taylor "was, in fact, exhibiting classic dangerous behaviors," and then contacted Mother's attorney. She also claims she contacted Taylor's attorney multiple times, who never returned her calls.

Duckworth describes the measures she took after Taylor came to her office the second time, including filing a report on January 14, 2020, with the Beaumont Police Department, installing security cameras and new locks, among other things. She also sent a notice to Taylor, telling him to cease and desist from any communications with her and her office members. Finally, she claims she advised Taylor "his actions were unwanted, unwelcome, and had become threatening." The

7

same day, Duckworth completed a "Denial of Access to Patient Information" form denying Taylor a copy of Sara's records, because she believed releasing them to him "could reasonably be expected to cause substantial and identifiable harm to Sara, her mother and/or herself, and that it would have a detrimental effect on her professional relationship with Sara or Sara's relationship with both her mother and father." She also notes that Taylor refused to complete all the required paperwork and consents, which was another reason to deny his request.

Duckworth relays that in July 2020, Taylor filed a complaint with her licensing board "erroneously alleging, among other things, that Ms. Duckworth's testimony at the February 2020 custody hearing was unethical and that Ms. Duckworth, along with [Mother], had manipulated Sara and lied about what the child was saying" to severely limit Taylor's time with Sara and prohibit him from having any rights to his daughter. According to Duckworth, Taylor alleged that she refused to give him a copy of the records despite his verbal and written requests and his attorney's request. Duckworth asserts that when denying Taylor's record request, she complied with statutory provisions governing her as an LPC. She states that she acted "appropriately and within the guidelines under which she is licensed[,]" and despite his allegations, she never received a request from Taylor's attorney at the time, as he appears to have sent it to a non-existent email address. The Texas Behavioral Health Executive Council ("BHEC") ultimately "found no merit in Mr.

8

Taylor's allegations against Ms. Duckworth and dismissed the complaint." When it did, Duckworth was advised Taylor already attempted to obtain Duckworth's records on Sara from BHEC, which Duckworth alleges resulted in an "Attorney General Opinion that he was not entitled to the records." Duckworth's counsel also learned that Taylor contacted a state legislator to try to have the BHEC reopen the matter.

Duckworth asserts that Taylor filed yet another complaint with the BHEC and a lawsuit containing the same allegations as in this suit in another Jefferson County District Court that were ultimately dismissed. She alleges this was because of her testimony in the February 2020 three-day custody hearing and Taylor's inability to obtain Sara's records from Duckworth, the licensing authority, or several attempts resulting in the family court judge signing two orders agreeing that the production of the records were not in Sara's best interest.

Duckworth claims that Taylor "has maliciously published false and defamatory statements of fact referring to Ms. Duckworth which have proximately caused her damages[.]" Duckworth complains specifically that Taylor "has been engaged in a campaign of harassment and defamation . . . which extends not only to verbal comments" but also in the following publications: (1) to his social media accounts; (2) his friends' social media accounts; and (3) in multiple YouTube videos. Duckworth alleges that in the YouTube videos Taylor has referred to her by name,

9

exhibited her picture, and provided her phone number and address "while making malicious, false and derogatory statements he attributes to Ms. Duckworth without any merit whatsoever."

Duckworth identifies eleven statements Taylor published that she alleges were defamatory, which include the following:

a. In a YouTube video titled "TEMPORARY RESTRAINING ORDERS ARE WEAPONS USED TO KICK A PARENT OUT OF CHILD'S LIFE," Mr. Taylor identified Ms. Duckworth by name, said that she is a "friend of the court" and that "that woman has been on YouTube more than a daytime soap opera – her name runs through the Jefferson County courthouse, Hardin courthouse, and Orange courthouse like it is just toilet paper."

b. In a YouTube video titled "ERICA DUCKWORTH VIOLATED HER CODE AND ETHICS AND COMMITTED AGGRAVATED PERJURY," Mr. Taylor accused Ms. Duckworth of violating her "code and ethics" (code of ethics), family code, and administrative code governing her license, as well as committing the crime of aggravated perjury.

c. In a YouTube video titled "DO FAMILY COURTS CREATE VIOLENCE?," Mr. Taylor stated that Ms. Duckworth lied to the judge, that she committed fraud and violated her code of ethics.

d. In a YouTube video titled "FAMILY COURTS REALLY ARE THAT BAD!," Mr. Taylor stated that Ms. Duckworth lied in medical records and that she improperly refused to hand over records.

e. In a March 10, 2021 Facebook post, Mr. Taylor posted an image of an appeal that he submitted, stating that Ms. Duckworth "violated the Texas Administrative Code for LPC, Texas Family Code, Texas Penal Code, and Texas Occupational Code."

f. In an August 7, 2023 Facebook post, Mr. Taylor stated that it is "time to stand up to state agencies that fail to hold 'licensed professionals'

10

accountable when they knowingly violate codes, ethics, and laws," insinuating that Ms. Duckworth is not actually a licensed professional.

g. In an August 11, 2023 Facebook post, Mr. Taylor stated that he was going to testify "against corrupt and unethical LPCs ruining lives of children and parents."

h. In a May 2, 2022 interview with K[FD]M, a Beaumont television station affiliated with CBS, The CW Plus, and Fox, Mr. Taylor stated that Ms. Duckworth "used false allegations with the purpose of separating [Mr. Taylor] from his daughter."

i. At the Texas Behavioral Health Executive Council's quarterly meeting on August 15, 2023, Mr. Taylor falsely stated to the members of the Council that Ms. Duckworth "was brought to a grand jury," that "there was probable cause of criminal activity and intent, fraud, fraud upon the court, negligent misrepresentation of material facts with malicious intent," that Ms. Duckworth "tampered with child's statements during sessions and reported that to a court" and accused Ms. Duckworth of "playing God in a court of law." Note that these statements by Mr. Taylor to the Council were not solicited by the Council and were not part of any hearing or any pending matter regarding Ms. Duckworth. Instead, Mr. Taylor showed up in Austin at the Council's meeting and made these libelous false statements to the Council.

j. At his child's Custody Trial on August 24, 2022, Mr. Taylor testified that Ms. Duckworth, who was not called to testify at the trial and was not present during any portion of the trial, along with all other healthcare professionals and attorneys on the opposing side of the case, were engaged in a plot to separate Mr. Taylor from his child. Before addressing the multiple board, complaints and lawsuits Mr. Taylor had filed against each individual healthcare professional and attorney on the opposing side of the case, including Ms. Duckworth, Mr. Taylor was asked "so, all these things that you're doing to all of us, you perceive that as a means to get us off this case because you think we're in this plot, true?" Mr. Taylor testified "Yes, ma'am."

k. As recent as last week, Mr. Taylor continued to espouse defamatory statements against Ms. Duckworth in a posted YouTube video entitled "CODY TAYLOR: A GREAT TEXAS DAD TURNED INTO A

11

"FACETIME FATHER" BY CORRUPT ANTI-FAMILY CO[U]RT INDUSTRY." In that most recent posting, Mr. Taylor continues to lie and attribute facts and statements to Ms. Duckworth that are patently untrue, makes statements regarding his entitlement to [Sara's] medical records when he is well aware Judge Thorne entered multiple Orders denying him those records, accuses Ms. Duckworth of violating the rules and statutes that govern her license, despite her licensing Board finding she had not, and then put sole blame for his minimal visitation with his daughter on Ms. Duckworth, as well as on Judge Thorne. This is just a sampling of the many blatantly false and malicious statements made by Mr. Taylor in this most recent posting.

With each of these statements, Duckworth provides a web link for where Taylor published them.

Duckworth complains that "Taylor's statements constitute explicit textual defamation because their defamatory meanings arise from the words of the statements themselves, without reference to any extrinsic evidence." Duckworth alleges that she "has been defamed as described" and that "Taylor has damaged Ms. Duckworth and continues to damage Ms. Duckworth on a daily basis." She also asserts that Taylor's defamatory statements were malicious; further, his statements falsely accused her of committing a crime and have directly impacted her profession, "constituting defamation per se." She asserts that Taylor's statements "have given rise to mental anguish and loss of reputation, both of which are presumed based solely on the statements." The counterclaim states that Taylor's defamatory statements proximately caused her damages, including actual, mental anguish, and

nominal. Finally, Duckworth seeks punitive damages based on Taylor's "malicious and false accusations" that she committed a crime.

## C. Taylor's Answer to the Counterclaim

The record does not contain an answer filed by Taylor to Duckworth's counterclaim.

## D. Taylor's TCPA Motion to Dismiss Defamation Counterclaim

On October 19, 2023, Taylor filed "Plaintiff's Motion to Dismiss Defendant's Counter-Claim Under TCPA, and Request for Attorney's Fees and Sanctions," contending that Duckworth's defamation claim was brought "to infringe his freedom of speech and right to petition." In support of this, he notes that Duckworth is complaining that (1) he spoke with Texas legislators, and (2) he exercised these rights by filing complaints against Duckworth with the BHEC.

Taylor contends the TCPA applies because Duckworth's complaint was to "punish" him for exercising his right to freedom of speech and to petition. He also challenges Duckworth's ability show a prima facie case, stating that "it does not appear Defendants have any evidence to support their allegations." Finally, he claims he has several affirmative defenses: (1) that his statements were true or were opinions rather than statements of fact; (2) it was Duckworth's fault for failing to send him a cease-and-desist letter asking Taylor to stop these communications; and (3) he did not intend to harm Duckworth and instead his goal was to inform parents.

13

He focuses on his involvement in "Texas Legislation, Law Reform, BHEC policy reform, . . . to ensure the accountability of those entrusted to provide a service to the public and potentially make huge recommendations or challenges in Texas Family Courts and against children/parents." He seems to contend that his statements were made to advocate for reform in the Texas family courts. He does not address any specific defamatory statements Duckworth raises in her counterclaim and does not address whether Duckworth is a public figure for purposes of determining whether the degree of fault requires actual malice or ordinary negligence. Taylor also requests sanctions and attorney's fees.

In support of his Motion to Dismiss, Taylor attaches several appendices, including: (1) TCPA provisions; (2) an unsworn document entitled "Case Background" outlining facts from the custody dispute; and (3) "Declaration of Mary Louise Serafine" asserting she assisted Taylor under a "limited representation" agreement and attaching her billing records. Taylor ultimately set his Motion to Dismiss for hearing on December 7, 2023.

**E. Duckworth's and Peaster's Response in Opposition to TCPA Motion to Dismiss**

On November 9, 2023, Duckworth and Peaster filed "Defendants/Counter-Plaintiff's Response in Opposition to Plaintiff/Counter-Defendant's Motion to Dismiss Defendants/Counter-Plaintiff's Counter-Claim Under TCPA and Request for Attorney's Fees and Sanctions." They argue that Taylor failed to establish the

14

counterclaim is based on his exercise of the right of free speech and right to petition. Specifically, they dispute Taylor's argument that their defamation claims are based on him speaking to legislators and filing complaints against Duckworth with the BHEC. Rather, they contend that even if the TCPA applies, Duckworth established a prima facie case for defamation and quotes the same eleven defamatory statements specified in the counterclaim that Taylor posted on YouTube with links. This includes Taylor's statement that Duckworth was "brought to a grand jury," and "there was probable cause of criminal activity and intent, fraud, fraud upon the court, negligent misrepresentation of material facts with malicious intent." They reference and attach a letter from the Jefferson County District Attorney's Office showing the grand jury no-billed the case in 2021 and that no criminal charges were pending against Duckworth. Finally, they contend that Taylor failed to establish an affirmative defense to justify dismissal. They separately contend that Taylor is not entitled to attorney's fees as a pro se litigant.

In support of their Response, Duckworth and Peaster include the following evidence: (1) letter from the Jefferson County District Attorney's Office stating that the Grand Jury no-billed the perjury charges against Duckworth on October 13, 2021, and there were no pending charges; (2) affidavit of Duckworth's attorney regarding attorney's fees; and (3) two orders from Travis County in unrelated matters pertaining to Serafine.

15

**F. Taylor's Reply to Defendant's Response to TCPA Motion**

On November 16, 2023, Taylor filed his "Reply to Defendant's Response to TCPA Motion." In that Reply, he again asserts as defenses that: (1) the statements were true; (2) the Defendants failed to follow the practices in the Defamation Mitigation Act under Texas Civil Practice and Remedies Code section 73.055 and timely request a correction, clarification or retraction; and (3) "all eleven (11) statements, publications, communications, interviews and other" were made as a matter of his opinion as matters of public concern about "the precise reasons as to which Defendants were a party to the child custody suit, that is to mislead the court to make a decision." In support of his reply, Taylor's only evidence addressed Serafine's "limited representation" of him. He did not deny making the eleven statements that Duckworth identified as defamatory.

**G. Duckworth's Supplemental Response to TCPA Motion to Dismiss**

On November 20, 2023, Duckworth and Peaster filed "Defendants/Counter-Plaintiffs' Supplemental Response and Reply to Plaintiff/Counter-Defendant's Motion to Dismiss and Reply to Defendants/Counter-Plaintiffs' Original Response." This Supplemental Response included more specific information about the responses people had to Taylor's statements about Duckworth. Specifically, Duckworth argues that the statements

> were believed by members of the public and the community who he published them to as true, and induced action and inaction by the

16

community to Duckworth's detriment. In support thereof, Duckworth has attached and does incorporate her Affidavit hereto as Exhibit A. On four (4) separate occasions, Duckworth's existing clients approached her with Taylor's defamatory statements and terminated their treatment with her. Ten (10) other existing clients raised concerns regarding Taylor's defamatory statements. Four (4) court referral sources brought up Taylor's defamatory statements and recommended that Duckworth take a break from court work throughout this time. Five (5) of Duckworth's colleagues have approached her about Taylor's defamatory statements. Additionally, Duckworth's family, friends, and other members of her community have reached out to her after seeing Taylor's defamatory statements on the Internet. Taylor damaged Duckworth's reputation and inflicted fear, stress, and mental anguish on Duckworth, her family, and her friends. . . . [O]nly if necessary, Duckworth incorporates by reference all links to the YouTube and news media videos referenced by footnote in her Response and this Supplemental Response and Reply.

In support of the Supplemental Response, Duckworth and Peaster attached the following evidence: (1) Duckworth's affidavit outlining how Taylor's defamatory statements have negatively impacted her business and harmed her reputation; and (2) "Declaration of Randal Cashiola for Attorney's Fees."

## H. Trial Court's Ruling

The trial court denied Taylor's TCPA Motion to Dismiss the defamation counterclaim after an oral hearing. Taylor timely appealed.

## II. Standard of Review

We review a trial court's denial of a TCPA motion to dismiss de novo. *See Walker v. Hartman*, 516 S.W.3d 71, 79–80 (Tex. App.—Beaumont 2017, pet. denied); *see also Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 897

17

(Tex. 2018). In determining whether a legal action is subject to the TCPA or should be dismissed under it, we consider the pleadings, evidence we could consider under Rule 166a, and affidavits stating facts on which liability or any defense is based in the light most favorable to the nonmovant. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a); *In re Lipsky*, 460 S.W.3d 579, 587 (Tex. 2015) (orig. proceeding); *see also Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019) (citation omitted). We also review de novo whether the parties met their burdens of proof under section 27.005 of the TCPA. *See Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 45–46 (Tex. 2021) (citation omitted); *Hall*, 579 S.W.3d at 377.

### III. Analysis

### A. TCPA Framework

The TCPA is meant "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002. The TCPA instructs courts to liberally construe it to ensure its stated purpose and intent are fully effectuated, but it "does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions." *See id.* § 27.011(a), (b); *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex.

2017) (citation omitted) (noting directive to liberally construe). Under the TCPA, a party may move to dismiss a "legal action" that is "based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association[.]" Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a); *see also Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 131 (Tex. 2019) (discussing right of free speech and right to petition). The TCPA defines the "[e]xercise of the right of free speech" as "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3); *see Montano v. Cronan*, No. 09-20-00232-CV, 2021 WL 2963801, at *4 (Tex. App.—Beaumont July 15, 2021, no pet.) (mem. op.).

The TCPA "provides a three-step process for the dismissal of a 'legal action' to which it applies." *Montelongo v. Abrea*, 622 S.W.3d 290, 296 (Tex. 2021) (citing *Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 691 (Tex. 2018)); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)–(d). First, the movant bears the initial burden to show that the "legal action is based on or is in response to[ ]" the movant's exercise of: "(1) the right of free speech; (2) the right to petition; or (3) the right of association[.]" Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)(1)(A)–(C). If the movant establishes that the nonmovant's claim implicates one of these rights, the burden shifts to the nonmovant to "'establish[ ] by clear and specific evidence a prima facie case for each essential element of the claim

19

in question.'" *Lipsky*, 460 S.W.3d at 587 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)). A "prima facie case" means "evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Id.* at 590 (citation omitted). It is the "'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004) (orig. proceeding)). Clear and specific evidence means that the "plaintiff must provide enough detail to show the factual basis for its claim." *Id.* at 591. Finally, if the nonmovant establishes their prima facie case, the burden shifts back to the movant to establish each essential element of an affirmative defense by a preponderance of the evidence. Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d); *Youngkin v. Hines*, 546 S.W.3d 675, 679–80 (Tex. 2018); *Coleman*, 512 S.W.3d at 899.

**B. Step One: Is the defamation counterclaim based on or in response to Taylor's exercise of the right of free speech or the right to petition?**

In his first sub-issue, Taylor contends that Duckworth's claims are based on his exercise of the right of free speech and the right to petition. We begin with whether Duckworth's defamation counterclaim as alleged in her pleading is based on or in response to Taylor's right to petition. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a). "The TCPA broadly defines 'exercise of the right to petition' and sets out several ways in which a communication can implicate this right." *Smith v. 2005 Tower LLC*, No. 09-22-00350-CV, 2024 WL 3616470, at *4 (Tex. App.—Beaumont

20

Aug. 1, 2024, pet. denied) (mem. op.) (citations omitted). As applicable here, the

TCPA provides,

> (4) "Exercise of the right to petition" means any of the following:
>> (A) a communication in or pertaining to:
>>> (i) a judicial proceeding;
>>> (ii) an official proceeding, other than a judicial proceeding, to administer the law;
>>> (iii) an executive or other proceeding before a department of the state or federal government or a subdivision of the state or federal government;
>>> (iv) a legislative proceeding, including a proceeding of a legislative committee;
>>> (v) a proceeding before an entity that requires by rule that public notice be given before proceedings of that entity;
>>> (vi) a proceeding in or before a managing board of an educational or eleemosynary institution supported directly or indirectly from public revenue;
>>> (vii) a proceeding of the governing body of any political subdivision of this state;
>>> (viii) a report of or debate and statements made in a proceeding described by Subparagraph (iii), (iv), (v), (vi), or (vii); or
>>> (ix) a public meeting dealing with a public purpose, including statements and discussions at the meeting or other matters of public concern occurring at the meeting[.]

Tex. Civ. Prac. & Rem. Code Ann. § 27.001(4). The statute further defines a "matter

of public concern" as:

> . . .a statement or activity regarding:
> (A) public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity;
> (B) a matter of political, social, or other interest to the community; or
> (C) a subject of concern to the public.

21

*Id.* § 27.001(7). Under the TCPA, a "'[c]ommunication' includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic." *Id.* § 27.001(1); *Ireland Fam. Ltd. P'ship v. Soloway*, No. 09-22-00192-CV, 2023 WL 2534062, at *6 (Tex. App.—Beaumont Mar. 16, 2023, pet. denied) (mem. op.) (citations omitted). The statute explains that a "governmental proceeding" is "a proceeding, other than a judicial proceeding, by an officer, official, or body of this state or a political subdivision of this state, including a board or commission, or by an officer, official, or body of the federal government." Tex. Civ. Prac. & Rem. Code Ann. § 27.001(5). Finally, the statute defines "official proceeding" as "any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant." *Id.* § 27.001(8).

In determining whether the TCPA applies, we look to the pleadings, evidence a court could consider under Texas Rule of Civil Procedure 166a, and any affidavits stating facts on which liability or a defense is based. *See id.* § 27.006(a); *Hersh v. Tatum*, 526 S.W.3d 462, 467 (Tex. 2017) (citation omitted) (explaining that "the court *shall* consider the pleadings"). The Texas Supreme Court has recognized that "the plaintiff's petition . . . is the 'best and all-sufficient evidence of the nature of the action.'" *Id.* (quoting *Stockyards Nat'l Bank v. Maples*, 95 S.W.2d 1300, 1302 (1936)). A legal action's basis is determined by the plaintiff's allegations rather than

the defendant's admissions or denials. *See id.* at 467. "When it is clear from the plaintiff's pleadings that the action is covered by the Act, the defendant need show no more." *Id.*

In her counterclaim, Duckworth identifies several allegedly defamatory statements as we outlined above. Those statements forming the basis of her defamation counterclaim fall into several general categories. The first category includes Taylor's statements made on YouTube, Facebook, and in local TV interviews about Duckworth's conduct during the child custody proceeding involving his daughter and posting images of an appeal he submitted, including allegations that she violated certain statutes and ethics governing her license, lied in medical records, and committed aggravated perjury, and discussing various orders issued by the court. This includes the alleged defamatory statements Duckworth identifies in her petition as items "b," "c," "d," "e," "h," and "k." These communications Duckworth identifies in her counterclaim pertain to a "judicial proceeding" implicating Taylor's exercising the right to petition. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(4)(A)(i). Thus, the TCPA applies to these statements. *See id.* § 27.003(a).

The second category of statements Duckworth bases her counterclaim on include Taylor's YouTube statements about Duckworth's conduct as "a friend of the court" in other court proceedings in nearby counties, including those she identifies

as item "a" in her counterclaim. Although this category does not pertain to Taylor's custody proceeding, this communication pertains to Duckworth's alleged conduct in various other judicial proceedings. *See id.* § 27.001(4)(A)(i). Since Duckworth's petition shows this statement on which she bases her defamation counterclaim likewise implicates Taylor's exercise of the right to petition as defined by the TCPA, we conclude the TCPA also applies to this statement. *See id.* § 27.003(a).

The third category of communications on which Duckworth bases her defamation counterclaim includes Taylor's defamatory statements made at a BHEC quarterly meeting, identified in the counterclaim as item "i." Duckworth asserts that Taylor falsely communicated to the BHEC that she was brought to a grand jury which determined there was "probable cause of criminal activity" and that she "tampered with the child's statements and reported that to a court." The BHEC "shall administer and enforce" Texas Occupations Code Chapters 501, 502, 503, 505, and 507. Tex. Occ. Code Ann. § 507.151(a). "The executive council shall develop and implement policies that provide the public with a reasonable opportunity to appear before the executive council and to speak on any issue under the jurisdiction of the executive council." *Id.* § 507.207. Every meeting of the BHEC or a member board "shall be open to the public" and the public must be provided "with a reasonable opportunity to appear before the respective body and offer public comment on any issue under the Council's or member board's jurisdiction." Tex. Admin. Code Ann.

24

§ 881.3(a), (d). Taylor's statements that Duckworth identifies in item "i" of her counterclaim made at a quarterly BHEC meeting involved Taylor's communications in an "executive proceeding before a department of the state or federal government or a subdivision of the state[,]" and communications made "in a public meeting dealing with a public purpose, including statements and discussions at the meeting. . ." that governs the licensing of professional counselors. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(4)(A)(ii), (ix). Again, a review of Duckworth's pleading reveals that her claims were based on Taylor's exercise of the right to petition as defined in the TCPA, so the TCPA applies to this communication. *See id.* § 27.003(a).

The fourth category of communications on which Duckworth bases her defamation counterclaim include Taylor's Facebook posts that it was time to stand up to state agencies that failed to hold "licensed professionals" accountable for violating applicable codes and ethics and that he would testify against "corrupt and unethical LPCs ruining the lives of children and parents." She identifies these as items "f" and "g" in her counterclaim, and although these statements were not made in a BHEC meeting, they pertain to executive proceedings and public meetings. *See id.* § 27.001(4)(A)(ii), (ix) (expressly including communications "pertaining to" "executive or other proceeding before a department of the state"). Therefore, these statements "pertaining to" testimony he planned to give to professional licensing

25

agencies as identified in Duckworth's counterclaim again implicate his right to petition, and the TCPA applies. *See id.* §§ 27.001(4)(A)(ii), (ix), 27.003(a).

Finally, item "j" is the last category of communication Duckworth identifies in her counterclaim as defamatory; it involves Taylor's testimony in the custody trial that Duckworth and other professionals engaged in a plot to separate him from his child. Taylor's testimony in the custody case which Duckworth claims was defamatory constitutes a "communication in . . . a judicial proceeding." *See id.* § 27.001(4)(A)(i). Likewise, Duckworth's pleading again shows that her defamation counterclaim was based on Taylor's exercise of the right to petition, so the TCPA applies. *See id.* §§ 27.001(4)(A)(i), 27.003(a).

Since Duckworth's pleading, which is the best evidence "of the nature of the action," establishes that her defamation counterclaim is based on Taylor's exercise of his right to petition, Taylor "need show no more." *Hersh*, 526 S.W.3d at 467. We conclude the TCPA applies to each defamatory statement Duckworth identifies in her counterclaim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a). We need not address Taylor's contention that Duckworth's counterclaim was based on his right to free speech. *See* Tex. R. App. P. 47.1 (requiring appellate court to hand down a written opinion as brief as practicable but addressing all issues necessary to appeal's final disposition).

**C. Step Two: Duckworth established a prima facie case for each essential element of a defamation claim by clear and specific evidence.**

Having determined that the TCPA applies to the communications Duckworth identifies in her petition as defamatory, the burden shifted to Duckworth to make a prima facie case for each essential element of her defamation claim by clear and specific evidence. *See Lipsky*, 460 S.W.3d at 587 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)). We now determine whether Duckworth met this burden.

For a defamation claim, a plaintiff must show (1) the defendant published a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the required degree of fault, at least amounting to negligence, and (4) in some cases, damages. *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020) (citing *Lipsky*, 460 S.W.3d at 593). "A defamatory statement is one that 'tends [ ] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 559 (AM. LAW INST. 1977)) (other citation omitted).

A party seeking to recover on a defamation claim must plead and prove damages, unless the defamatory statements are defamatory per se. *Lipsky*, 460 S.W.3d at 593. "A statement constitutes defamation *per se* if it 'injures a person in his office, profession, or occupation.'" *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013) (quoting *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.*,

27

219 S.W.3d 563, 581 (Tex. App.—Austin 2007, pet. denied)). Likewise, "accusing someone of a crime, of having a foul or loathsome disease, or of engaging in serious sexual misconduct" constitutes defamation per se. *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 638 (Tex. 2018) (citations omitted); *Lipsky*, 460 S.W.3d at 596; *Montano*, 2021 WL 2963801, at *5. "Historically in Texas, defamation *per se* claims allow the jury to presume the existence of general damages without proof of actual injury." *Hancock*, 400 S.W.3d at 65 (citations omitted). "In a defamation case that implicates the TCPA, pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist a TCPA motion to dismiss." *Lipsky,* 460 S.W.3d at 591. "Defamation per se refers to statements that are so obviously harmful that general damages may be presumed." *Id.* at 593 (citation omitted). Whether a statement is defamatory per se is generally a question of law. *See id.* at 596.

In *Hancock*, the Texas Supreme Court held that statements impugning a physician's veracity were not defamatory per se since they did not injure the physician in his profession by ascribing that he lacked a requisite skill peculiar or unique to being a physician. *See Hancock*, 400 S.W.3d at 67; *see also Bedford v. Spassoff*, 520 S.W.3d 901, 905 (Tex. 2017) (discussing same). "'Disparagement of a general character, equally discreditable to all persons, is not enough unless the

28

particular quality disparaged is of such a character that it is peculiarly valuable in the plaintiff's business or profession.'" *Bedford*, 520 S.W.3d at 905 (quoting RESTATEMENT (SECOND) OF TORTS § 573 cmt. e).

"'In a defamation case that implicates the [Act], pleadings and evidence that establishes the facts of when, where, and what was said, the defamatory nature of the statements, and how they damaged the plaintiff should be sufficient to resist' a motion to dismiss under the Act." *Id.* at 904 (quoting *Lipsky*, 460 S.W.3d at 591). Here, Duckworth identifies statements in her counterclaim that Taylor "maliciously published false and defamatory statements of fact." She specifies where Taylor made the statements, when they were made, and their contents. She also explains in her counterclaim that the statements were false, that Taylor identified her in the statements, and outlines with particularity the facts disputing Taylor's statements. Duckworth alleges that Taylor has accused her of committing a crime and have directly impacted her profession, thus "constituting defamation per se." She also asserts that "Taylor's statements constitute explicit textual defamation because their defamatory meanings arise from the words of the statements themselves, without reference to any extrinsic evidence." The statements Duckworth identifies as defamatory show that Taylor accused her of committing perjury and specifically said that it was brought to a grand jury which determined there was probable cause, repeatedly claimed that she violated her code of ethics, violated the laws governing

her profession, improperly refused to turn over records, and engaged in a plot to separate Taylor from his daughter.

Duckworth's evidence supporting her Response and Supplemental Response includes (1) a letter from the Jefferson County District Attorney's Office showing the Grand Jury no-billed the perjury charge and (2) her affidavit outlining the details of her practice and how Taylor's statements impacted her business. She explains that she has been a licensed professional counselor since 2012 and sees an average of forty-three clients per week with a percentage breakdown of adult versus child clients. She avers that seeing clients in her practice generates an average annual revenue of $279,500.00. Duckworth states that she participates "in court-ordered reunification cases, parent facilitation cases, court-ordered family therapy sessions, and court-ordered individual therapy sessions, which generate an estimated total annual revenue of $25,500.00." In her affidavit, Duckworth describes how Taylor's defamatory statements damaged her:

> 4. As a direct result of Taylor's inaccurate, false, and disparaging comments/statements about me on social media sites including Facebook and YouTube, as well as his statements made during public meetings of the Texas Behavioral Health Executive Counsel [sic], to name a few, there has been a notable negative impact on my practice. Specifically, I have had at least three clients who began seeing me, only to not return for continued therapy, advising that they had seen Taylor's postings and YouTube videos, and no longer felt comfortable returning to my practice. Additionally, I have lost at least 3 and potentially numerous other clients who have brought this matter involving Taylor to my attention. I have had an additional 10 clients bring Taylor's videos to my attention and have had . . . referral sources also raise the

30

issue of the videos with me, recommending that I take a break from the Court work. As a direct result of Taylor's actions, the impact on my practice, financially, at the present time, has been anywhere from $26,000.00 to $31,000.00, to the best of my knowledge. This would not include those potential clients who have chosen not to see me as a direct result of Taylor's accusations, lies and disparaging comments, said amount being unquantifiable.

5. In addition to the foregoing, I have had 5 colleagues approach me about the videos, and countless family, friends, and members of the community have addressed Taylor's postings and videos with me as well. I have no doubt that for every client who actually came to my practice to see me and did not return in follow-up due to Taylor's postings, there are inevitably others who did not come at all because of Taylor's defamatory statements in his postings and the postings of others who he has befriended and with whom he has shared his false narrative.

The pleadings and evidence establish that Taylor made statements that Duckworth committed perjury, violated her code of ethics and laws governing her license, engaged "in a plot" to separate him from his daughter, lied in court, falsified records, and improperly refused to turn over his child's records. His claims that Duckworth committed perjury, a crime, constitute defamation per se, so damages are presumed. *See Tatum*, 554 S.W.3d at 638 (citations omitted); *Lipsky*, 460 S.W.3d at 596; *Montano*, 2021 WL 2963801, at *5. Likewise, his other statements that Duckworth violated statutes and ethics governing her licensing requirements as a counselor injured Duckworth in her profession by undermining requisite "skills peculiar or unique to being a" licensed professional counselor also constitute defamation per se. *See Bedford*, 520 S.W.3d at 905; *Hancock*, 400 S.W.3d at 67. Additionally, Duckworth's court-appointed work as a counselor, requires veracity

31

and candor. As such, Taylor's statements that she engaged in a plot in court to separate him from his daughter, falsified records, lied in court, and refused to turn over his child's records undermined Duckworth's requisite skills as a court-appointed LPC since "the particular quality disparaged is of such a character that it is particularly valuable in the plaintiff's business or profession." *See Bedford*, 520 S.W.3d at 905. Accordingly, these statements similarly rose to the level of defamation per se. *See id.* Even if his other statements do not constitute defamation per se, Duckworth's affidavit, as outlined above, establishes she has sustained some measure of damages caused by Taylor's false statements.

For the first time on appeal, Taylor disputes Duckworth's characterization and description of the identified statements and complains about the web links contained in her pleadings. He also seemingly argues that because the exhibits attached Duckworth's Response and Supplemental Response were not admitted at the hearing on his Motion to Dismiss, they do not constitute evidence. He contends that pleadings are not evidence, and Duckworth's pleadings fail to show the factual basis for her claims. These arguments lack merit. First, Taylor failed to complain about Duckworth's providing web links to these statements in the trial court and cannot now do so on appeal. *See* Tex. R. App. P. 33.1(a) (requiring a timely, specific complaint in the trial court and a ruling to preserve error). Second, the TCPA specifically instructs courts to consider the pleadings, any evidence we could

consider under Rule 166a, and affidavits in the light most favorable to the nonmovant when determining whether the parties met their burdens of proof under the TCPA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a) (instructing courts to consider the pleadings and affidavits, among other things when determining whether a case should be dismissed under the TCPA); *Lipsky*, 460 S.W.3d at 586–87; *Gulf Coast Pros, LLC v. Sweeney*, No. 09-23-00320-CV, 2024 WL 3057494, at *1 (Tex. App.—Beaumont June 20, 2024, no pet.) (mem. op.) (noting same). Finally, although we agree fair notice pleading is not enough to satisfy the prima facie burden in a defamation case, we have already outlined above that Duckworth's pleading shows a factual basis for her claims. *See Lipsky*, 460 S.W.3d at 590–91.

Since Duckworth's pleadings and evidence establish when, where, what was said, the defamatory nature of the statements, and how they damaged her, they are "'sufficient to resist' a motion to dismiss under the Act." *See Bedford*, 520 S.W.3d at 904 (quoting *Lipsky*, 460 S.W.3d at 591). We conclude Duckworth has met her burden of establishing by clear and specific evidence a prima facie case for defamation as to each of the statements outlined above as they show (1) Taylor published a false statement of fact to a third party, (2) that was defamatory concerning Duckworth, (3) with the required degree of fault, at least amounting to negligence, and (4) damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c);

33

*see also Innovative Block*, 603 S.W.3d at 417 (stating elements of defamation claim); *Lipsky*, 460 S.W.3d at 593 (same).

**D. Step Three: Duckworth established a prima facie case for defamation, but Taylor failed to meet his burden of establishing each essential element of an affirmative defense by a preponderance of the evidence.**

Since Duckworth met her burden of establishing a prima facie case for defamation as to each of the defamatory statements identified, we now address whether Taylor met his burden to establish each essential element of an affirmative defense as a matter of law. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d); *Hall*, 579 S.W.3d at 377; *Youngkin*, 546 S.W.3d at 680. "When determining whether a party who seeks to dismiss the plaintiff's case under the TCPA has met its burden on this third step, we apply a standard of review essentially equivalent to a motion for summary judgment on an affirmative defense." *USA Today v. Ryan, LLC*, No. 09-22-00432-CV, 2024 WL 1914792, at *10 (Tex. App.—Beaumont May 2, 2024, no pet. h.) (mem. op.) (citing *H-E-B, L.P. v. Maverick Int'l, Ltd.*, No. 09-21-00311-CV, 2022 WL 5237402, at *4 (Tex. App.—Beaumont Oct. 6, 2022, pet. granted, judgm't vacated w.r.m.) (mem. op.)) (other citation omitted). In applying that standard, "the movant must establish every element of its affirmative defense as a matter of law, such that a reasonable factfinder can draw only one conclusion from the evidence." *Id.* at *16 (citing Tex. R. Civ. P. 166a; *Rockman v. Ob Hospitalist*

*Grp., Inc.*, No. 01-21-00383-CV, 2023 WL 3311548, at \*14 (Tex. App.—Houston [1st Dist.] May 9, 2023, no pet.) (mem. op.)).

On appeal, Taylor asserts the affirmative defenses of truth and that Duckworth failed to serve him with a cease-and-desist letter. Despite Taylor's assertions, the record reveals that in his TCPA Motion to Dismiss, Taylor generally claims that his statements (1) were true or constituted opinions, (2) that Duckworth was at fault for failing to send him a cease-and-desist letter, and (3) that he had no intent to harm her. Beyond general statements, he outlines no facts in his TCPA Motion to Dismiss supporting these affirmative defenses. Although he provides an "Appendix 2" outlining further background from the custody case, he offers no affidavits or other evidence supporting these affirmative defenses. In Appendix 2, Taylor summarizes purported testimony from Dr. Kit Harrison, the Child Custody Evaluator, but does not explain how that makes the statements Duckworth identifies true and fails to attach excerpts of this testimony or any affidavits pertaining to these facts. *See* Tex. R. Civ. P. 166a (discussing permissible evidence in a summary judgment proceeding). In his Motion to Dismiss, Taylor fails to explain how any facts outlined in Appendix 2 support his affirmative defenses. Additionally, Taylor's Reply to Duckworth's Response to the TCPA Motion to Dismiss fails to include any evidence apart from Serafine's affidavit addressing her limited representation. Thus, we determine Taylor has failed to meet his burden of establishing each essential element

35

of an affirmative defense as a matter of law. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d); Tex. R. Civ. P. 166a; *Ryan*, 2024 WL 1914792, at *10, 16.

As outlined above, we conclude (1) the TCPA applies, (2) Duckworth met her burden of establishing a prima facie case for defamation by clear and specific evidence, and (3) Taylor failed to meet his burden of establishing each essential element of an affirmative defense as a matter of law. Therefore, the trial court properly denied Taylor's TCPA Motion to Dismiss Duckworth's Counterclaim. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)–(d). We overrule Taylor's sole issue.

## IV. Conclusion

Having overruled Taylor's issue, we affirm the trial court's order denying his TCPA Motion to Dismiss.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on July 11, 2024
Opinion Delivered January 16, 2025

Before Golemon, C.J., Johnson and Wright, JJ.